| | |
|---|---|
| Daniel E. Doherty (DD–2145)<br>7300 W. 110th Street, Suite 930<br>Overland Park, Kansas 66210<br>Tel: (913) 338-7182<br>Fax: (913) 338-7164<br>Email: ded@ddoherty.net | James A. Hunter (JH–1910)<br>42 Stagecoach Road<br>Pipersville, Pennsylvania 18947<br>Tel: (484) 437-5935<br>Fax: (646) 462-3356<br>Email: hunter@hunterkmiec.com |
| *Attorney for Plaintiff Revive Investing LLC* | *Attorney for Plaintiff Calenture, LLC* |

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CALENTURE, LLC and REVIVE INVESTING LLC,<br><br>Plaintiffs,<br><br>– v. –<br><br>KAREN J. PULTE and MARK T. PULTE, as Co-Trustees of the William J. Pulte Trust dtd 01/26/1990, as amended,<br><br>Defendants,<br><br>– and –<br><br>PULTEGROUP, INC.,<br><br>Nominal Defendant. | ECF CASE<br><br>No. 21-cv-402<br><br>COMPLAINT FOR RECOVERY OF SHORT-SWING PROFIT UNDER 15 U.S.C. § 78p(b)<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs Calenture, LLC and Revive Investing LLC (collectively, "Plaintiffs"), by their undersigned attorneys, plead for their complaint as follows:

### INTRODUCTION

1. This is an action for disgorgement under Section 16(b) of the Securities Exchange Act of 1934, as amended (the "Act"), 15 U.S.C. § 78p(b).

2. Section 16 was the "original and only express 'insider' trading

provision[]" of the Act.  Richard W. Jennings et al., Securities Regulation: Cases and Materials 1202 (8th ed. 1998).  Its purpose is to "prevent[] the unfair use of information that may have been obtained by [an insider] by reason of his relationship to the issuer." 15 U.S.C. § 78p(a).

3. Section 16 applies to the directors and officers of every issuer with a class of publicly traded equity securities.  *Id.* § 78p(a), (b).  It also applies to every beneficial owner of more than 10% of any such class.  *Id.*  Under Section 16(b), these "insiders" must disgorge to the issuer any profit they realize from any purchase and sale of the issuer's equity securities within a period of less than six months.  *Id.* § 78p(b).  If an insider fails to disgorge this "short-swing" profit, the statute empowers the issuer, or "the owner of any security of the issuer," to bring suit to recover it.  *Id.*

4. Liability under Section 16(b) is strict.  The profit from a short-swing transaction must be disgorged "irrespective of any intention on the part of [the insider] in entering into such transaction."  *Id.*  Recovery never depends on proof of scienter, a breach of duty, or the actual misuse of inside information.  *See Reliance Elec. Co. v. Emerson Elec. Co.*, 404 U.S. 418, 422 (1972).

5. Plaintiffs, both shareholders of Nominal Defendant PulteGroup, Inc. ("PulteGroup"), bring this action against Karen J. Pulte and Mark T. Pulte as trustees of the William J. Pulte Trust dtd 01/26/1990, as amended (the "Pulte Trust").  The Pulte Trust realized more than a million dollars of "short-swing" profit while its representative served as a director on PulteGroup's board.  Under Section 16(b) of the Act, this profit is now PulteGroup's lawful property, which the Pulte Trust is strictly liable to account for and repay.

## JURISDICTION AND VENUE

6. Jurisdiction is conferred on this Court by Section 27 of the Act, 15 U.S.C. § 78aa, and by 28 U.S.C. § 1331.

7. Venue lies in this District under Section 27 of the Act and 18 U.S.C. § 1401 because certain of the transactions described in paragraph 63 below were executed through the facilities of New York Stock Exchange LLC, a national securities exchange registered under Section 6 of the Act, 15 U.S.C. § 78f, and located in this District.

## THE PARTIES

### The Parties to This Action

8. Plaintiff Calenture, LLC is a limited liability company formed under the law of the State of New York with a principal place of business located in New York, New York.

9. Plaintiff Revive Investing LLC is a limited liability company formed under the law of the State of Texas with a principal place of business located in Georgetown, Texas.

10. Defendant Karen J. Pulte ("Karen Pulte") is a natural person and a resident of the State of Florida. At all times since March 2018, she has served as one of two trustees of the Pulte Trust, an express trust settled under the law of the State of Michigan. Plaintiffs name Karen Pulte as a defendant not in her personal capacity but solely as a trustee of the Pulte Trust, the trust not being susceptible to suit in its own name under New York law.

11. Defendant Mark T. Pulte ("Mark Pulte") is a natural person and a resident of the State of Florida. He is the son or stepson of Karen Pulte and has served at all times since March 2018 as one of the two trustees of the Pulte Trust. Plaintiffs name Mark Pulte as a defendant not in his personal capacity but solely as a trustee of the Pulte Trust, the trust not being susceptible to suit in its own name under New York law.

12. Nominal Defendant PulteGroup, Inc., which Plaintiffs refer to as "PulteGroup," is a corporation formed under the law of the State of Michigan. At all relevant times, PulteGroup's common shares were registered under Section 12(b) of the Act, 15 U.S.C. § 78*l*(b), and were listed for trading on the New York Stock Exchange. This action is brought in the right and for the benefit of PulteGroup, which is named as a nominal defendant solely to ensure that all necessary parties are before the Court.

### Other Relevant Parties

13. William J. Pulte (1932–2018) (the "Elder Pulte") was the founder of PulteGroup and for many years its key person. He settled the Pulte Trust in 1990 and served as its sole trustee until his death in March 2018, when his wife Karen Pulte and son Mark Pulte succeeded him as co-trustees. Acting on behalf of the Pulte Trust, the Elder Pulte engineered the appointment of his grandson as the trust's representative on PulteGroup's board as described below.

14. William J. Pulte (b. 1988) (the "Younger Pulte") is a natural person, a resident of the State of Florida, and the grandson of the Elder Pulte. Pursuant to an agreement between the Pulte Trust and PulteGroup, the Younger Pulte served as the former's representative on the latter's board of directors from September 8, 2016 to May 7, 2020. He is also the son of Mark Pulte and the grandson (or step-grandson) of Karen Pulte.

## FACTS

### Background

15. PulteGroup is a publicly traded company in the business of real estate development and homebuilding.

16. The Elder Pulte formed PulteGroup in 1956 and served on and off as its chairman and chief executive officer until 1992. He remained a member of its board of directors until his retirement in 2010.

### The Grosfeld Appointment

17. At the time of the Elder Pulte's retirement, PulteGroup's chairman and chief executive officer was an individual named Richard J. Dugas ("Dugas").

18. The Elder Pulte had hired Dugas as chief executive back in 2003 and supported him through the early years of his tenure.

19. By 2015, however, the Elder Pulte had soured on Dugas and was lobbying for a management shakeup.

20. The Elder Pulte's agitations could not be ignored. Not only was he PulteGroup's founder and namesake, but he also beneficially owned (primarily through the Pulte Trust) more than 8% of the company's common shares. Members of the board, including Dugas himself, were soon meeting with him to discuss changes to management.

21. Although the Elder Pulte did not publicly disclose these early maneuvers, they came to light in an administrative proceeding brought against him by the SEC, which subsequently charged him with violating the disclosure requirements of Section 13(d) of the Act. A true and correct copy of the SEC's order of December 7, 2017 in that proceeding is attached as Exhibit A to this complaint.

22. According to the SEC's order, the Elder Pulte first proposed a leadership change to PulteGroup in September 2015. He called Dugas that month and proposed that PulteGroup appoint to its board James Grosfeld ("Grosfeld"), a former executive who had served as PulteGroup's chairman and CEO from 1974 to 1990.

23. The Elder Pulte renewed his request for Grosfeld's appointment in calls and meetings with Dugas in October 2015. According to the SEC's order, the Elder Pulte characterized the appointment as a "favor" Dugas should do for him.

24. On November 1, 2015, Grosfeld called Dugas himself. As related in the SEC's order, Grosfeld told Dugas "that William Pulte [the Elder Pulte], as PulteGroup's largest shareholder, needed to have a representative on PulteGroup's board, and that he [Grosfeld] should be appointed to the board to fulfill that role."

25. Dugas and a few members of the board met with Grosfeld in mid-November 2015. Among the written materials prepared in connection with the meeting was a director questionnaire for Grosfeld. The questionnaire included the following statements: "The Pulte Family has urged that you be added to our board and you agree. And you have made the comment that a 10% shareholder deserves to have representation on the board."

26. The board capitulated within weeks. It appointed Grosfeld as a new PulteGroup director on December 2, 2015.

27. Grosfeld's appointment was unorthodox in a significant respect: he was 78 years old at the time. This meant that he exceeded PulteGroup's normal age limit for board membership, and the board had to waive the limit for him to be seated.

28.     The SEC's order records Dugas's explanation for the appointment as follows: "PulteGroup's then-CEO believed that [Grosfeld] was appointed as a direct result of William Pulte's demands to the board, in part, because [Grosfeld's] age would have otherwise disqualified him entirely from consideration."

29.     PulteGroup would subsequently confirm in an April 2016 press release that Grosfeld had been appointed "at the behest of Mr. Pulte."

### The Appointment of the Younger Pulte

30.     Grosfeld's appointment prefigured another power play by the Elder Pulte just a few months later.  This second campaign would add a new Pulte family representative to the board: the Younger Pulte.

31.     The campaign to install the Younger Pulte on the board came together in January 2016, when the Elder Pulte made up his mind that Dugas had to go.

32.     That month, the Elder Pulte met with a former PulteGroup employee to propose that the former employee replace Dugas as CEO.  Also present at the meeting were Grosfeld and an individual whom the SEC's order described as "a close relative of William Pulte's."

33.     Although the order does not identify this "close relative," subsequent events make clear that the individual in question was the Younger Pulte. These events include public statements by both Dugas and the Younger Pulte, the latter of which was reported in an April 2016 article in *Crain's Detroit Business*.

34.     Later in January 2016, the Elder Pulte asked the Younger Pulte whether it would be possible to change PulteGroup's name to "Pulte Homes."  According

-7-

to the SEC order, the Younger Pulte "responded that he would 'take care of' the request" if they were successful in ousting Dugas.

35. Under pressure, PulteGroup issued a press release on April 4, 2016, announcing Dugas's resignation as CEO. The resignation was not to take effect until May 2017, over a year later.

36. This half-measure did not satisfy the Elder Pulte, who pressed for a quicker, cleaner break to Dugas's tenure.

37. Over the next few months, the Elder Pulte, the Younger Pulte, and Grosfeld gave interviews, issued press releases, and made television appearances calling for Dugas's immediate resignation.

38. Around the same time, on April 12, 2016, Grosfeld announced his resignation from the board. His notice, e-mailed directly to Dugas, charged that "[s]ince the Board meeting of March 22, I have been excluded from a number of subsequent Board meetings, and therefore see no useful purpose of remaining on the Board."

39. The following week, the Elder Pulte made his first appeal directly to PulteGroup shareholders. In an 11-page open letter, he demanded Dugas's immediate resignation from "all . . . positions with the Company," along with the resignation of lead PulteGroup director Jim Postl ("Postl").

40. The same letter also demanded that Dugas and Postl "be immediately replaced by direct shareholder representatives on the Board."

41. On July 21, 2016, PulteGroup announced the appointment of three new independent directors.

42. The Elder Pulte responded that same day with an open letter to PulteGroup shareholders. The letter applauded the "positive news" of the independent director appointments while noting that the number of nonmanagement directors with homebuilding experience still stood at just 1 of 12. According to the Elder Pulte, the company needed "more industry talent at the Board level."

### The Settlement Agreement

43. On September 8, 2016, Dugas tendered his resignation as PulteGroup's chief executive, effective immediately.

44. That same day, PulteGroup announced that it was expanding its board by one seat and appointing the Younger Pulte to fill the new vacancy.

45. In his earlier missives and public statements, the Elder Pulte had urged PulteGroup to leaven its board with experienced homebuilders aligned with the company's shareholders. The Younger Pulte did not check this box. At the time of his appointment, he had little experience as a homebuilder and owned no PulteGroup stock.

46. But the Younger Pulte's appointment owed little to his experience or any investment in the company. PulteGroup appointed him because the Elder Pulte, in his capacity as trustee of the Pulte Trust, wanted a family representative on the board.

47. The Younger Pulte's appointment was made pursuant to a letter agreement of September 8, 2016 between PulteGroup on the one hand and the Elder Pulte and Younger Pulte on the other. Plaintiffs refer to this agreement, as PulteGroup did in its public disclosure, as the "Settlement Agreement".

48. A true and correct copy of the Settlement Agreement is attached as Exhibit B to this complaint.

49. Also parties to the Settlement Agreement were the Pulte Trust and a second trust settled by Joan Pulte, the Elder Pulte's late former wife. The Elder Pulte had contributed a substantial amount of his PulteGroup stock to these trusts, and he signed the Settlement Agreement as their trustee in addition to signing in his personal capacity.

50. As of September 8, 2016, the day the Settlement Agreement was inked, the Pulte Trust held a total of 23,117,664 PulteGroup shares, or about 6.7% of shares outstanding. These 23,117,664 shares accounted for about 75% of all PulteGroup shares held by the Pulte family.

51. The Settlement Agreement obligated PulteGroup to appoint the Younger Pulte to the board and, with limited exceptions, to include him in its slate of nominees for the election of directors at its 2017 annual meeting.

52. PulteGroup was also obligated to appoint the Younger Pulte to at least two committees of the board.

53. If the Younger Pulte became unable or unwilling to serve as a director, the Settlement Agreement gave the Pulte Trust the right to propose a replacement candidate. Subject to narrow exceptions, PulteGroup was generally obligated to appoint the replacement to the board in place of the Younger Pulte.

54. In exchange for a seat on the board, the Pulte Trust agreed to cause all of its PulteGroup common shares to be counted at any meeting of PulteGroup's shareholders and to be voted against any director nominees not nominated by the board. The Pulte Trust also agreed to vote in accordance with the board's recommendations on

most other matters submitted to the shareholders and to refrain from engaging in or assisting any hostile proxy solicitation.

55. The Pulte Trust's rights in the new directorship were to terminate if the Pulte family's holdings declined to less than 3.0% of PulteGroup's shares outstanding on the date of the Settlement Agreement. At that point, PulteGroup would have no further obligation to appoint the Younger Pulte to the board or any committee or to nominate him for any future election of directors.

56. But provided that the ownership threshold was met, the Settlement Agreement's substantive terms were to remain in force so long as the Younger Pulte (or his replacement) sat on PulteGroup's board.

57. The agreement ultimately remained in force from September 8, 2016 until the conclusion of PulteGroup's 2020 annual meeting on May 7, 2020, when the Younger Pulte departed the board without replacement.

58. The Younger Pulte's appointment was intended to forestall, and did forestall, a proxy contest by granting the Elder Pulte what he had asked for a year earlier when he seated Grosfeld: "a representative on PulteGroup's board."

59. On September 9, 2016, the day after the Settlement Agreement was signed, the Elder Pulte's attorneys issued a press release crowing that their client had "reache[d] [an] agreement for board representation at PulteGroup."

60. And like Grosfeld, the Younger Pulte pushed the age envelope, though in a different way. At the time of his appointment, the Younger Pulte was just 28 years old.

### The Elder Pulte's Passing
### and the Section 16(b) Transactions

61. The Elder Pulte passed away in March 2018.

62. As a result of his death, the fiduciary responsibilities for the Pulte Trust passed to his wife Karen Pulte and son Mark Pulte, who became the trust's new co-trustees.

63. While the Pulte Trust's deputy sat on PulteGroup's board of directors in the person of the Younger Pulte, the Pulte Trust made the following short-swing trades in PulteGroup's equity securities:

(a) On November 26, 2018, the Pulte Trust sold 300,000 PulteGroup common shares over the open market at a price of $26.0138 per share.

(b) On January 7, 2019, the Pulte Trust sold 250,000 PulteGroup common shares over the open market at a price of $28.2990 per share.

(c) On January 9, 2019, the Pulte Trust sold 250,000 PulteGroup common shares over the open market at a price of $28.7897 per share.

(d) In a second transaction on January 9, 2019, the Pulte Trust sold 250,000 PulteGroup common shares over the open market at a price of $29.0575 per share.

(e) On January 17, 2019, the Pulte Trust sold 250,000 PulteGroup common shares over the open market at a price of $26.8408 per share.

(f) In a second transaction on January 17, 2019, the Pulte Trust sold 30,400 PulteGroup common shares over the open market at a price of $27.0043 per share.

(g) On January 18 and 22, 2019, the Pulte Trust purchased call options referencing a total of 900,000 PulteGroup common shares for a total price of $450,000.

64. The call options described in paragraph 63(g) above were derivative securities of PulteGroup's common shares, and their purchase was functionally equivalent to a purchase of the common shares for purposes of Section 16(b) of the Act. *See* 17 C.F.R. §§ 240.16a-1(b), (c), 240.16a-4(a), 240.16b-6(a).

65. The per-share purchase price imputed to the purchase of the call options described in paragraph 63(g) above is supplied by the contemporaneous price of PulteGroup's common shares at the time of purchase. *See id.* § 240.16b-6(c)(2).

66. Plaintiffs have estimated the contemporaneous price of PulteGroup's common shares based on the closing price of the company's publicly traded common shares on January 18, 2019 and January 22, 2019.

67. The closing price on January 18, 2019 was $26.59 per share, and the closing price on January 22, 2019 was $26.33 per share.

68. The following table summarizes the Section 16(b) treatment of the Pulte Trust's transactions described in paragraph 63 above:

| Date of Transaction | Transaction | Number of Shares | Price per Share |
|---|---|---|---|
| 11/26/2018 | Sale of Common Shares | 300,000 | $26.0138 |
| 01/07/2019 | Sale of Common Shares | 250,000 | $28.2990 |
| 01/09/2019 | Sale of Common Shares | 250,000 | $28.7897 |
| 01/09/2019 | Sale of Common Shares | 250,000 | $29.0575 |
| 01/17/2019 | Sale of Common Shares | 250,000 | $26.8408 |

| Date of Transaction | Transaction | Number of Shares | Price per Share |
|---|---|---|---|
| 01/17/2019 | Sale of Common Shares | 30,400 | $27.0043 |
| 01/18/2019 | Purchase of Common Shares | (1) | $26.5900 (2) |
| 01/22/2019 | Purchase of Common Shares | (1) | $26.3300 (2) |

(1) Call options referencing a total of 900,000 common shares were purchased on January 18, 2019 and January 22, 2019.

(2) Estimated from the closing price of PulteGroup's publicly traded common shares. *See* 17 C.F.R. §§ 240.16a-1(b), (c), 240.16b-6(a), (c)(2).

69. From the foregoing transactions, the Pulte Trust realized a recoverable profit of approximately $1.75 million.

## Statutory Prerequisites

70. Demand for recovery of the Pulte Trust's short-swing profit was made on PulteGroup by a shareholder of the company on January 24, 2019.

71. More than 60 days have passed since that demand was made. Further delay would be futile, PulteGroup having rejected the demand by letter of March 25, 2019.

## SOLE CLAIM FOR RELIEF: DISGORGEMENT UNDER 15 U.S.C. § 78p(b) (AGAINST DEFENDANTS KAREN PULTE AND MARK PULTE)

72. Plaintiffs reallege and incorporate by reference the allegations in paragraphs 1-71 above.

73. Section 16(b) of the Securities Exchange Act of 1934, as amended, reads in pertinent part as follows:

> For the purpose of preventing the unfair use of information which may have been obtained by [a 10 percent] beneficial owner,

> director, or officer by reason of his relationship to the issuer, any profit realized by him from any purchase and sale, or any sale and purchase, of any equity security of such issuer (other than an exempted security) or a security-based swap agreement involving any such equity security within any period of less than six months, unless such security or security-based swap agreement was acquired in good faith in connection with a debt previously contracted, shall inure to and be recoverable by the issuer, irrespective of any intention on the part of such beneficial owner, director, or officer in entering into such transaction of holding the security or security-based swap agreement purchased or of not repurchasing the security or security-based swap agreement sold for a period exceeding six months. Suit to recover such profit may be instituted at law or in equity in any court of competent jurisdiction by the issuer, or by the owner of any security of the issuer in the name and in behalf of the issuer if the issuer shall fail or refuse to bring such suit within sixty days after request or shall fail diligently to prosecute the same thereafter; but no such suit shall be brought more than two years after the date such profit was realized.

15 U.S.C. § 78p(b).

74. At all relevant times, the Pulte Trust was a statutory director of PulteGroup, having deputized the Younger Pulte to sit as its representative on PulteGroup's board of directors.

75. While subject to Section 16(b) of the Act as a statutory director, the Pulte Trust purchased and sold PulteGroup's equity securities as further described herein.

76. The Pulte Trust's sales of PulteGroup's equity securities occurred within less than six months of the Pulte Trust's purchases of PulteGroup's equity securities.

77. Certain of the Pulte Trust's sales of PulteGroup's equity securities occurred at higher prices than certain of the Pulte Trust's purchases of PulteGroup's equity securities.

78. The Pulte Trust had a direct or indirect pecuniary interest in all of PulteGroup's equity securities purchased and sold as described herein.

79. Under the "lowest-in, highest-out" method for computing realized profit pursuant to Section 16(b) of the Act, the Pulte Trust realized a recoverable profit estimated at $1,753,640.40 from its transactions in PulteGroup's equity securities described herein.

80. Under Section 16(b) of the Act, the profit realized by the Pulte Trust as described in paragraph 79 above inured to PulteGroup and remains PulteGroup's lawful property, recoverable by Plaintiffs in its stead, PulteGroup having declined to seek recovery of the same despite due and timely demand.

## DEMAND FOR JURY TRIAL

Plaintiffs respectfully demand a trial by jury on all questions so triable.

[*prayer for relief follows on next page*]

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray this Court for judgment:

(a) Requiring Defendants, in their capacity as the trustees of the Pulte Trust, to account for and pay over to PulteGroup the short-swing profit realized and retained by the Pulte Trust in violation of Section 16(b) of the Act in an amount not less than $1,753,640.40, together with appropriate pre- and post-judgment interest and the costs of this suit;

(b) Awarding Plaintiffs their costs and disbursements including reasonable attorney's, accountant's, and expert witness fees; and

(c) Granting Plaintiffs such further relief as the Court deems just and proper.

Dated: January 15, 2021

| /s/ Daniel E. Doherty | /s/ James A. Hunter |
|---|---|
| Daniel E. Doherty<br>7300 W. 110th Street, Suite 930<br>Overland Park, Kansas  66210<br>Tel: (913) 338-7182<br>Fax: (913) 338-7164<br>Email: ded@ddoherty.net | James A. Hunter<br>42 Stagecoach Road<br>Pipersville, Pennsylvania  18947<br>Tel: (484) 437-5935<br>Fax: (646) 462-3356<br>Email: hunter@hunterkmiec.com |
| *Attorney for Plaintiff Revive Investing LLC* | *Attorneys for Plaintiff Calenture, LLC* |