# Exhibit A

UNITED STATES OF AMERICA
Before the
SECURITIES AND EXCHANGE COMMISSION

SECURITIES EXCHANGE ACT OF 1934
Release No. 82233 / December 7, 2017

ADMINISTRATIVE PROCEEDING
File No. 3-18298

| | |
|---|---|
| In the Matter of<br><br>**WILLIAM J. PULTE**<br><br>Respondent. | ORDER INSTITUTING CEASE-AND-DESIST PROCEEDINGS PURSUANT TO SECTION 21C OF THE SECURITIES EXCHANGE ACT OF 1934, MAKING FINDINGS, AND IMPOSING A CEASE-AND-DESIST ORDER AND CIVIL PENALTY |

**I.**

The Securities and Exchange Commission ("Commission") deems it appropriate that cease-and-desist proceedings be, and hereby are, instituted pursuant to Section 21C of the Securities Exchange Act of 1934 ("Exchange Act"), against William J. Pulte ("William Pulte").

**II.**

In anticipation of the institution of these proceedings, William Pulte has submitted an Offer of Settlement (the "Offer"), which the Commission has determined to accept. Solely for the purpose of these proceedings and any other proceedings brought by or on behalf of the Commission, or to which the Commission is a party, and without admitting or denying the findings herein, except as to the Commission's jurisdiction over him and the subject matter of these proceedings, which are admitted, William Pulte consents to the entry of this Order Instituting Cease-and-Desist Proceedings Pursuant to Section 21C of the Securities Exchange Act of 1934, Making Findings, and Imposing a Cease-and-Desist Order and Civil Penalty ("Order"), as set forth below.

### III.

On the basis of this Order and William Pulte's Offer, the Commission finds[1] that:

### Summary

1. This matter concerns violations of the reporting provisions of Section 13(d) of the Exchange Act by William Pulte. Section 13(d)(1) of the Exchange Act, together with Rule 13d-1(a), requires the filing of a Schedule 13D, commonly referred to as a "beneficial ownership report," when a person or group of persons acting together for the purpose of acquiring, holding, or disposing of securities, directly or indirectly acquires beneficial ownership of more than 5% of a voting class of a company's Section 12-registered equity securities. Section 13(d)(2) and corresponding Rule 13d-2(a) thereunder also require the filing of an amendment when there is a material change in the facts set forth in the Schedule 13D.

2. William Pulte failed to timely file amendments to his Schedule 13D regarding plans resulting in changes to the board of directors and management of PulteGroup. Notwithstanding the fact that William Pulte's Schedule 13D on file affirmatively stated that he did not plan to change the present board of directors or management of PulteGroup, as of no later than October 31, 2015, William Pulte had taken a series of steps in furtherance of a plan to have a former PulteGroup CEO (the "Former CEO") appointed to the PulteGroup Board of Directors. William Pulte, however, failed to report material changes to his disclosures under Item 4 of his Schedule 13D to disclose these actions until April 12, 2016, more than five months after he incurred the amendment obligation, and only after PulteGroup had already filed a Form 8-K with an accompanying press release stating that the Former CEO was appointed to the board of directors "at the behest of" William Pulte.

3. Additionally, as of no later than March 21, 2016, William Pulte had also taken steps to replace PulteGroup's then-CEO, which was directly contrary to his Schedule 13D disclosure on file. William Pulte failed to disclose these actions until April 4, 2016 only after PulteGroup had already filed a Form 8-K with an accompanying press release stating that William Pulte had demanded the then-CEO's immediate resignation.

### Respondent

4. William J. Pulte, age 85, is the founder and former chairman and CEO of PulteGroup.[2] William Pulte served as CEO at various times from 1956 until 1992, and served on

---

[1] The findings herein are made pursuant to William Pulte's Offer of Settlement and are not binding on any other person or entity in this or any other proceeding.

[2] PulteGroup was originally founded in 1956 as William J. Pulte, Inc., and was subsequently renamed Pulte Home Corporation in 1969, Pulte Corporation in 1992, Pulte Homes, Inc. in 2001, and PulteGroup, Inc. in 2010. It is referred to within this Order as "PulteGroup," the name by which it was known at the time of the conduct described herein.

PulteGroup's board of directors from 1956 until 2010. At the time of the violative conduct described herein, William Pulte beneficially owned 8.2% of PulteGroup's common shares. William Pulte is a United States citizen who currently resides in Florida.

## Legal Framework

5. Section 13(d)(1) of the Exchange Act and Rule 13d-1(a) thereunder together require any person or group who has acquired, directly or indirectly, beneficial ownership of more than five percent of a class of a registered equity security to file a statement with the Commission disclosing the identity of its members and the purpose of its acquisition. *See generally GAF Corp. v. Milstein*, 453 F.2d 709, 717 (2d Cir. 1971), *cert. denied*, 406 U.S. 910 (1972). Entities or individuals comply with Section 13(d) of the Exchange Act by filing a Schedule 13D with the Commission no later than ten days after they accumulate beneficial ownership of more than five percent of the class of equity security.

6. Exchange Act Rule 13d-101, which sets forth items which must be reported in a Schedule 13D, requires filers to disclose, *inter alia*, the identity of the acquirer, including beneficial owners and the interest of all persons making the filing, including those acting together as a group. Rule 13d-101 further provides a list of plans or proposals that a reporting person may have that would trigger an Item 4 reporting obligation, including those which relate to or would result in "[a]ny change in the present board of directors or management of the issuer, including any plans or proposals to change the number or term of directors or to fill any existing vacancies on the board." The duty to file under Section 13(d) of the Exchange Act and Rule 13d-1 requires that the reporting person file truthfully and completely. *SEC v. Savoy Industries*, 587 F.2d 1149, 1165 (D.C. Cir. 1978) *cert. denied*, 440 U.S. 913 (1979).

7. Section 13(d)(2) of the Exchange Act and Rule 13d-2(a) together require that a Schedule 13D must be promptly amended when there are material changes or developments in the information previously reported. Qualitative disclosures providing narrative in response to line item requirements of Rule 13d-101 are subject to material changes.

8. There is no state of mind requirement for violations of Section 13(d) and the rules thereunder. *See SEC v. Levy*, 706 F. Supp. 61, 63-69 (D.D.C. 1989). The failure to timely file a Schedule 13D or an amendment to an existing Schedule 13D, even if inadvertent, constitutes a violation. *Herbert Moskowitz*, 77 SEC 446, 2002 WL 434524, at *7 (Mar. 21, 2002) (Commission opinion).

## William Pulte's Failure to Report Material Change to Plans or Proposals Relating to a Change in PulteGroup's Board of Directors

9. When William Pulte amended his Schedule 13D on September 14, 2014, he reported that he beneficially owned 30,830,239 PulteGroup common shares, representing 8.2% of the company (based on 375,945,651 shares outstanding). In the Item 4 disclosure of that Schedule 13D, William Pulte affirmatively stated that he did not have any plans or proposals which related

to or would result in, *inter alia*, "any change in the present board of directors or management of PHM, including any plans or proposals to change the number or term of directors or to fill any existing vacancies on the board."

10. In the middle of September 2015, William Pulte called PulteGroup's then-CEO and requested that he arrange a meeting between the Former CEO and the PulteGroup Board of Directors, stating that the Former CEO was "a smart guy" and that he "never should have separated" from PulteGroup.

11. In mid-October 2015, William Pulte and the Former CEO met and discussed what they perceived to be the poor performance of PulteGroup's stock price during PulteGroup's then-CEO's twelve-year tenure. Within a few days, William Pulte called PulteGroup's then-CEO again and asked whether he had spoken to the PulteGroup Board of Directors about meeting with the Former CEO. When PulteGroup's then-CEO responded in the negative, William Pulte expressed that he was unhappy with PulteGroup's stock price and that the Former CEO could help the company.

12. On October 31, 2015, William Pulte again called PulteGroup's then-CEO and demanded that the Former CEO be appointed to the PulteGroup Board of Directors. On the call, William Pulte specifically advised the then-CEO, "I've never asked you for a favor before. I'm asking you to put [the Former CEO] on the board." PulteGroup's then-CEO responded that he would have to speak to the Former CEO before taking any action toward an appointment. By this time, William Pulte's plans had materially changed from the statements set forth in his Schedule 13D, and his actions directly contravened the statement in his then-current Item 4 disclosure that he had no intentions of changing the membership of PulteGroup's board of directors.

13. On November 1, 2015, the Former CEO called PulteGroup's then-CEO and stated that William Pulte, as PulteGroup's largest shareholder, needed to have a representative on PulteGroup's board, and that he should be appointed to the board to fulfill that role.

14. On November 2, 2015, William Pulte called PulteGroup's then-CEO and again demanded that the Former CEO be appointed to PulteGroup's board of directors. During this call, William Pulte made clear that the issue could not wait until PulteGroup's board meeting scheduled for December. Later that day, on a call with PulteGroup's board of directors, the then-CEO told the other directors about William Pulte's repeated demands.

15. On November 3, 2015, PulteGroup's board of directors convened a special meeting where the then-CEO updated the board on discussions that he had with William Pulte and the Former CEO regarding William Pulte's desire to have the Former CEO appointed as a member of PulteGroup's board. The board also discussed the possibility of a potential public proxy context arising as a result of the actions of William Pulte and the Former CEO.

16. Shortly thereafter, PulteGroup's then-CEO reached out to the Former CEO and scheduled a meeting to discuss the possibility of his appointment to the board. During the meeting,

4

which took place in mid-November 2015 and was attended by the then-CEO and a few board members, the Former CEO presented ideas to the board regarding PulteGroup's land acquisition strategy and deferred tax assets. As reflected in a contemporaneous questionnaire that PulteGroup's board created in connection with this meeting, the board raised questions about the nature of the Former CEO's relationship with William Pulte, stemming from prior discussions with the Former CEO.  For example, the questionnaire states, "The Pulte Family has urged that you be added to our board and you agree.  And you have made the comment that a 10% shareholder deserves to have representation on the board."

17.     Subsequently, on December 2, 2015, as a result of William Pulte's repeated requests, PulteGroup's board of directors voted to appoint the Former CEO as an independent director, effective immediately.  In order to appoint the Former CEO to the board, PulteGroup's Nominating and Governance Committee had to waive the company's age policy for directors, as the Former CEO exceeded the company's age restriction.  PulteGroup's then-CEO believed that the Former CEO was appointed as a direct result of William Pulte's demands to the board, in part, because the Former CEO's age would have otherwise disqualified him entirely from consideration.

18.     Notwithstanding William Pulte's actions to place the Former CEO on the board, which triggered a requirement to amend the Item 4 disclosures in his Schedule 13D no later than October 31, 2015, William Pulte did not amend his Schedule 13D to notify the public of his actions involving the appointment of the Former CEO until April 12, 2016, more than five months after he incurred the amendment obligation, and only after PulteGroup had already filed a Form 8-K with an accompanying press release stating that the Former CEO was appointed to the board of directors "at the behest of Mr. Pulte."

**William Pulte's Failure to Report Material Change to Plans or Proposals Relating to a Change in PulteGroup's Management**

19.     William Pulte began exploring the possibility of replacing PulteGroup's then-CEO in January 2016.  On January 7, 2016, William Pulte, the Former CEO, and a close relative of William Pulte's (the "Pulte Relative") met with a former PulteGroup area president (the "Former Area President"), to discuss the possibility that the Former Area President could replace PulteGroup's then-CEO.  At the conclusion of this meeting, William Pulte stated that the Former Area President would be the next CEO of PulteGroup.  At the time of this statement and until April 4, 2016, William Pulte's Schedule 13D stated that he had no plans relating to a change in PulteGroup's management.

20.     In mid-January, 2016, William Pulte asked the Pulte Relative if PulteGroup's name could be changed to Pulte Homes.  The Pulte Relative responded that he would "take care of" the request if he, the Former CEO, and the Former Area President were "victorious" in ousting PulteGroup's then-CEO.

21.     On January 16, 2016, the Pulte Relative sent an email to the Former CEO stating that he wanted to launch a charitable initiative in Atlanta, the city where PulteGroup's

5

headquarters is located, to outperform the then-CEO's charitable activities and demonstrate that the then-CEO was "all talk, no action."  The Pulte Relative explained, "Trust me, trust me, [PulteGroup's then-CEO] wants nothing to do with confrontation nor tampering with his virgin media presence.  We need to open the door for him to walk out now."

22.     On January 18, 2016, the Former CEO sent an email to the Pulte Relative asking for his opinion on the possibility of pressuring PulteGroup's directors to fire PulteGroup's then-CEO by telling them that "we have over 20% going into any proxy contest" and that they had secured the support of several former PulteGroup executives.  The Pulte Relative responded that the PulteGroup Board of Directors "probably would take that very seriously and perhaps consent to fire [PulteGroup's then-CEO].  I still think the path of least resistance is to talk to [PulteGroup's then-CEO] and have him cave.  Then you can pull that card if he doesn't quit.  I think [PulteGroup's then-CEO] quits if he is hit hard enough and he knows the 20% won't stop until he is gone."

23.     On March 21, 2016, at the request of William Pulte, PulteGroup's then-CEO met with the Pulte Relative, the Former CEO, and William Pulte.  During that meeting, William Pulte, the Pulte Relative, and the Former CEO stated their disapproval of several of the then-CEO's actions, including the institution of policies regarding profit sharing and land acquisition, moving the company's headquarters from Detroit to Atlanta, and the failure to retain various upper-level employees.  In the midst of voicing these grievances, William Pulte asked PulteGroup's then-CEO to resign within ten days.  At the conclusion of the meeting, William Pulte stated that if PulteGroup's then-CEO declined to step down there would be "war."

24.     On March 29, 2016, William Pulte, the Pulte Relative, and the Former CEO met with two members of PulteGroup's board.  At this meeting, as reflected in contemporaneous notes from individuals who were present, William Pulte presented a list of twenty to thirty items that he believed constituted "major problems" with PulteGroup for which the then-CEO was responsible.  William Pulte then reiterated his demand that the then-CEO step down as soon as possible.  The Former CEO stated that William Pulte had a list of two or three former PulteGroup executives that he was ready to submit as candidates to be the new PulteGroup CEO.  The PulteGroup directors at the meeting proposed that, in order to address William Pulte's grievances, PulteGroup's then-CEO could retire in September 2016.  After conferring with the Pulte Relative and the Former CEO, William Pulte declined that proposal and stated that the then-CEO would have seven days to announce his retirement, which could take effect no later than May 31, 2016.  As reflected on the notes from the meeting, the Pulte family was "convinced that they would prevail" in a proxy contest and "willing to pursue this option if we can't reach agreement quickly."

25.     On April 4, 2016, PulteGroup filed a form 8-K and accompanying press release stating that PulteGroup's then-CEO would be retiring in May 2017.  The press release explained that the decision was made, in part, because William Pulte, the Pulte Relative, and the Former CEO "had demanded an immediate CEO change."  On that same day, after PulteGroup submitted its public filing, William Pulte amended his Schedule 13D, and disclosed, among other

6

things, that he had "from time to time, engaged in discussions with [PulteGroup's then-CEO], members of the board of directors of PHM . . . and PHM's management with respect to a change in PHM's Chief Executive Officer and certain business strategy matters."

26.   Despite the fact that William Pulte took substantial steps in furtherance of a plan to replace PulteGroup's CEO, which represented a material change from the facts set forth in his Schedule 13D on file and triggered a requirement to amend no later than March 21, 2016, William Pulte failed to amend his Schedule 13D until April 4, 2016.

27.   Subsequently, consistent with his threat of going to "war" at the March 21 meeting, William Pulte, the Pulte Relative, and the Former CEO, launched a public campaign, including television appearances, written interviews, and the issuance of several press releases, in which they criticized PulteGroup's then-CEO's performance and reiterated their demand that he resign immediately. William Pulte also retained public relations and communications firms "to condition the environment such that shareholders, other key stakeholders and, ultimately the [b]oard, recognize the imperative of making a CEO transition as soon as practical."

28.   As a result of the public campaign, PulteGroup announced on September 8, 2016, that its CEO would retire, effective immediately.

## Violations

29.   By engaging in the conduct described above, William Pulte violated Section 13(d)(2) of the Exchange Act and Rule 13d-2 thereunder.

## William Pulte's Cooperation

30.   In determining to accept the Offer, the Commission considered the cooperation William Pulte provided to Commission staff.

## IV.

In view of the foregoing, the Commission deems it appropriate to impose the sanctions agreed to in William Pulte's Offer.

Accordingly, it is hereby ORDERED that**:**

A.   Pursuant to Section 21C of the Exchange Act, William Pulte cease and desist from committing or causing any violations and any future violations of Section 13(d)(2) of the Exchange Act and Rule 13d-2 thereunder.

B.   William Pulte shall, within fourteen days of the entry of this Order, pay a civil money penalty in the amount of $33,000.00 to the Securities and Exchange Commission for transfer to the general fund of the United States Treasury, subject to Exchange Act Section

21F(g)(3). If timely payment is not made, additional interest shall accrue pursuant to 31 U.S.C. § 3717.

Payment must be made in one of the following ways:

(1) William Pulte may transmit payment electronically to the Commission, which will provide detailed ACH transfer/Fedwire instructions upon request;

(2) William Pulte may make direct payment from a bank account via Pay.gov through the SEC website at http://www.sec.gov/about/offices/ofm.htm; or

(3) William Pulte may pay by certified check, bank cashier's check, or United States postal money order, made payable to the Securities and Exchange Commission and hand-delivered or mailed to:

Enterprise Services Center
Accounts Receivable Branch
HQ Bldg., Room 181, AMZ-341
6500 South MacArthur Boulevard
Oklahoma City, OK 73169

Payments by check or money order must be accompanied by a cover letter identifying William Pulte as a respondent in these proceedings, and the file number of these proceedings; a copy of the cover letter and check or money order must be sent to Gerald W. Hodgkins, Division of Enforcement, Securities and Exchange Commission, 100 F St., NE, Washington, DC 20549.

C. Amounts ordered to be paid as civil money penalties pursuant to this Order shall be treated as penalties paid to the government for all purposes, including all tax purposes. To preserve the deterrent effect of the civil penalty, William Pulte agrees that in any related investor action, he shall not argue that he is entitled to, nor shall he benefit by, offset or reduction of any award of compensatory damages by the amount of any part of William Pulte's payment of a civil penalty in this action ("Penalty Offset"). If the court in any related investor action grants such a Penalty Offset, William Pulte agrees that he shall, within thirty days after entry of a final order granting the Penalty Offset, notify the Commission's counsel in this action and pay the amount of the Penalty Offset to the Securities and Exchange Commission. Such a payment shall not be deemed an additional civil penalty and shall not be deemed to change the amount of the civil penalty imposed in this proceeding. For purposes of this paragraph, a "related investor action" means a private action for damages brought against William Pulte by or on behalf of one or more investors based on substantially the same facts as alleged in the Order instituted by the Commission in this proceeding.

## V.

It is further Ordered that, solely for purposes of exceptions to discharge set forth in Section 523 of the Bankruptcy Code, 11 U.S.C. § 523, the findings in this Order are true and admitted by William Pulte, and further, any debt for disgorgement, prejudgment interest, civil penalty or other amounts due by William Pulte under this Order or any other judgment, order, consent order, decree or settlement agreement entered in connection with this proceeding, is a debt for the violation by William Pulte of the federal securities laws or any regulation or order issued under such laws, as set forth in Section 523(a)(19) of the Bankruptcy Code, 11 U.S.C. §523(a)(19).

By the Commission.

Brent J. Fields
Secretary